**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| LAURENT A. JOHNSON | ) | CASE NO:    1:06-cv-2714 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | NANCY A. VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff Laurent A. Johnson ("Johnson") challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Johnson's claim

for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental

Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision

of the Commissioner be AFFIRMED.

## I.  Procedural History

On August 12, 2003, Johnson filed an application for POD, DIB, and SSI alleging a disability onset date of June 5, 2002, and claiming he was disabled due to congestive heart failure, hypertension, sleep apnea, cardiac arrhythmia, hypothyroidism, stress, and low back pain.  Johnson's application was denied initially and upon reconsideration.  Johnson timely requested an administrative hearing.

On October 31, 2005, Administrative Law Judge Eve B. Godfrey ("ALJ") held a hearing during which Johnson, represented by counsel, testified.  John Morse, M.D., a board-certified internist, testified as the medical expert ("ME") and Nelly Katsell, M.S., testified as the vocational expert ("VE").  On April 7, 2006, the ALJ found Johnson was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Johnson filed an appeal to this Court.

On appeal, Johnson claims the ALJ erred by: 1) finding that Johnson can perform the exertional demands of light work; and 2) failing to fully and fairly develop the record.

## II.  Evidence

### Personal and Vocational Evidence

Born on October 24, 1952 and age 53 at the time of his administrative hearing, Johnson is an individual "closely approaching advanced age" pursuant to 20 C.F.R. §§ 404.1563(b) & 416.963(b).  Johnson has a high school general education development (GED) diploma and past relevant work experience as a sales attendant, cashier/checker, and warehouse worker.

***Medical and Evidence***

On June 11, 2001, the record indicates that Johnson complained of shortness of breath, but the medical notes demonstrate the presence of left upper extremity numbness, atypical chest pain, and congestive heart failure.  (Tr. 158.)

On September 4, 2001, Johnson suffered from edema with a medical impression of congestive heart failure, lower leg edema, and various other conditions.  (Tr. 151.)

On January 11, 2002, the record states that Johnson suffered from back pain and was prescribed Ultracet as a remedy.  (Tr. 147-148.)

On May 16, 2003, Johnson visited the emergency room to have five prescriptions refilled.  (Tr. 236.)  He indicated that he had not been on his medications since August of 2002 because he was unable to afford them.  *Id.*  Johnson told Steven J. Shor, M.D., that he was experiencing back pain, chest tightness, and shortness of breath while walking.  *Id.*  Dr. Shor observed that Johnson had good muscle strength, a normal gait, no neurological abnormalities, and no acute joint problems. (Tr. 237.)  Dr. Shor diagnosed Johnson with very mild congestive heart failure and hypertension.  *Id.*

On May 28, 2003, A. Seenam Lee, M.D., noted Johnson had a history of sleep apnea and, upon examination, noted lower back pain an radiculopathy.  (Tr. 186.)  Johnson's sleep apnea was treated with a BiPAP machine, a mechanical ventilator with a nasal or face mask used during sleep.  *Id.*

On June 13, 2003, Johnson was examined by Jung Lee, M.D.  (Tr. 272.)  During the initial examination, Johnson complained of weight gain, shortness of breath, fatigue, and heart palpitations.  (Tr. 272.)  He denied any chest pain.  (Tr. 272.)  To treat Johnson's hypertension,

3

Dr. Lee increased his dosages of Lisinopril and Toprol.  (Tr. 273.)  Dr. Lee recommended that Johnson continue taking Lasix at his current dosage.  (Tr. 273.)  Dr. Lee ordered an "echo with doppler" and referred Johnson to James Cho, M.D., a cardiologist.  (Tr. 273.)  Dr. Lee also urged Johnson to continue use of the BiPAP machine for his sleep apnea.  (Tr. 273.)

On July 2, 2003, Dr. Cho evaluated Johnson regarding the potential presence of congestive heart failure.  (Tr. 263-64.)  A chest x-ray suggested congestive heart failure.  (Tr. 263.)  Dr. Cho noted that Johnson was markedly obese at 305 pounds with blood pressure of 140/100.  *Id.*  Dr. Cho found Johnson's lungs were symmetrical and clear.  *Id.*

On September 8, 2003 at a follow-up exam, Dr. Cho noted that Johnson's blood pressure was reduced to 120/90.  *Id.*  Further laboratory testing demonstrated the absence of adrenal hypertension.  *Id.*  On September 16, 2003, a persantine nuclear stress test demonstrated that Johnson was negative for ischemia or scarring with an ejection fraction of 57%.  (Tr. 263.)  Dr. Cho diagnosed Johnson with the following: hypertension, controlled, probably essential; chest pain, atypical; congestive heart failure, compensated; left ventricular systolic dysfunction, improved; hyperlipidemia; hyperthyroidism, status post I-131 treatment; and back pain.  (Tr. 264.)  Dr. Cho recommended that Johnson return for follow-up evaluation in six months.  (Tr. 264.)

On October 22, 2003, an x-ray of Johnson's lumbar spine indicated minor degenerative changes.  (Tr. 220.)

On November 5, 2003, Johnson returned for a follow-up examination with Dr. Lee.  (Tr. 259.)  Dr. Lee diagnosed him with back pain, hyperlipidemia, low thyroid-stimulating hormone ("TSH"), congestive heart failure, sleep apnea, and hypertension, which had improved.  *Id.*

4

On November 12, 2003, Johnson underwent a consultative examination performed by Adi Gerblich, M.D.  (Tr. 199-200.)  Johnson stated that he suffered from shortness of breath on a daily basis.  *Id*.  He also stated that it is difficult to walk up and down stairs and he is able to walk only one block.  *Id*.  Johnson's electrocardiogram indicated the presence of first degree heart block and possibly left atrial enlargement.  *Id*.  Further spirometric testing demonstrated moderate obstructive and restrictive ventilatory defects which did not improve after bronchodilator therapy.  (Tr. 190.)  Dr. Gerblich's impressions included the following: congestive heart failure, controlled; obstructive sleep apnea, controlled; hypertension, uncontrolled; hyperthyroidism, controlled; and benign prostatic hypertrophy, under treatment. (Tr. 200.)

On January 14, 2004, a pulmonary function laboratory report indicated the presence of mild restrictive lung disease and a moderate reduction in diffusing capacity.  (Tr. 208.)

On January 23, 2004, W. Holbrook, M.D., a state reviewing physician, completed a Physical RFC Assessment regarding Johnson.  (Tr. 284-289.)  Dr. Holbrook determined that Johnson had the following limitations.  He can lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk at least two hours, and sit for about six hours in an eight hour workday. (Tr. 285.)  Johnson has a poor cardiorespiratory reserve and develops dyspnea if he walks for a total time period greater than two to three hours.  *Id*.  Within Johnson's limitations on lifting objects, he had an unlimited ability to push or pull objects.  (Tr. 285.)  Johnson is morbidly obese with a body mass index ("BMI") of 45 and suffers from sleep apnea requiring C-Pap; his bouts of congestive heart failure do not allow him to climb a flight of stairs or walk more than one block.  *Id*.  Johnson could occasionally balance, stoop, kneel, crouch, and crawl

5

but could never climb ramps, stairs, ladders, ropes, or scaffolds.  (Tr. 286.)  Johnson should

avoid exposure to machinery, heights, concentrated exposure to extreme cold, extreme heat,

fumes, odors, dusts, gases, and poor ventilation.  (Tr. 287.)  Johnson did not have any limitations

concerning exposure to wetness, humidity, noise, and vibration.  *Id*.

On January 30, 2004, Dr. Lee noted that Johnson should continue Lisinopril for

hypertension and Lasix for congestive heart failure, see an endocrinologist regarding his low

TSH, see Geauga Rehabilitation regarding his sleep apnea, and get an x-ray of the left side of the

ribs to evaluate his chest pain.  (Tr. 257-258.)

On March 1, 2004 Johnson returned for a follow-up examination with Dr. Lee regarding

hypertension and chest pain. (Tr. 253.)  Johnson's chest pain was determined to be

musculoskeletal; Dr. Lee advised him to continue taking Ultram.  *Id*.  Dr. Lee also indicated that

he would make appointments with an endocrinologist and the sleep center regarding Johnson's

low TSH and sleep apnea, respectively.  *Id*.

On April 7, 2004, Dr. Lee continued to diagnose Johnson with hypertension and added a

prescribed Norvasc in addition to his previous medications.  (Tr. 251.)  Two weeks later, Dr. Lee

increased the prescribed dosage of Norvasc.  (Tr. 249.)

On June 14, 2004, David Rath, M.D., the state reviewing physician, completed an RFC

Assessment.  (Tr. 276.)  Dr. Rath made the following conclusions.  Johnson can lift 20 pounds

occasionally, 10 pounds frequently, walk between two and three hours in a work day, stand for

six hours in a work day, sit for six hours each day, and push or pull an unlimited amount with the

given weight restrictions.  *Id*.  Johnson could occasionally climb ramps or stairs, stoop, kneel,

crouch, and crawl but could never climb ladders, ropes, or scaffolds.  (Tr. 277.)  Johnson should

avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation, and unprotected heights. (Tr. 279.)  Johnson should avoid concentrated exposure to extreme heat and extreme cold.  *Id.*  However, Johnson was permitted to have unlimited exposure to wetness, humidity, noise, and vibrations.  *Id.*

On October 19, 2004, David House, Ph.D., a clinical psychologist, performed a psychological evaluation of Johnson.  (Tr. 290-293.)  When asked about substance abuse, Johnson began to cry and left the evaluation prior to completion.  (Tr. 290-291.)  Dr. House indicated that he could not assign a psychological diagnosis, identify psychosocial stressors, or assess Johnson's Global Assessment of Functioning ("GAF") ability.  (Tr. 293.)  Dr. House found that there were no indications that Johnson suffered from auditory hallucinations.  (Tr. 292.)  Dr. House stated that Johnson was oriented regarding person, place, time, and situation. (Tr. 292.)  Johnson presented himself as being at least moderately depressed and may have been markedly limited in his ability to withstand stress and pressure and his ability relate to others. (Tr. 293.)  Dr. House's limited assessment of Johnson's concentration and attention indicated that he suffers from a markedly decreased attention span.  (Tr. 292.)  Dr. House requested that Johnson return to finish the psychological evaluation, but he declined to do so.  (Tr. 306.)

On November 3, 2004, Caroline Lewin, Ph.D. completed a Psychiatric Review Technique regarding Johnson with respect to Listing 12.04.  (Tr. 294.)  Dr. Lewin could not arrive at a conclusion because Johnson did not complete a psychological examination and did not notify Dr. Lewin as to why he did not complete the examination. (Tr. 306.)  As such, there was insufficient evidence to formulate a conclusion.  *Id.*

On November 22, 2004, Johnson was examined by Barry Brooks M.D. (Tr. 309.)  Dr.

Brooks reviewed Johnson's medications and diagnosed him with congestive heart failure. (Tr. 309.)

***Hearing Testimony***

On October 31, 2005, Johnson testified at the administrative hearing as follows. He lived alone, he never had a driver's license, and he was able to get around by taking the bus or receiving rides from his mother. (Tr. 337.)

Johnson testified that he most recently worked at Home Depot as a sales associate and his duties included customer service, stocking, and cleaning. (Tr. 337-38.) The heaviest object that he was required to lift on a regular basis weighed about fifty to seventy-five pounds. (Tr. 338.) He stopped working at Home Depot in June of 2002 because he was having difficulty carrying out his duties, particularly lifting, standing and walking. (Tr. 338-39.)

Johnson had worked in customer service at a lumber company and his duties included loading purchased lumber into customers' vehicles. (Tr. 338-39.) The heaviest objects that he typically was required to lift weighed approximately ten to thirty pounds. *Id.* He was required to stand for the majority of the workday. *Id.*

Johnson had worked part-time, about twenty to twenty-five hours per week, at a local store from 1987 until 1996. (Tr. 340.) His duties included stocking the cooler and working at the register. *Id.* He testified that the heaviest objects that he was required to lift were cases of liquor that generally weighed approximately thirty to forty pounds. *Id.* Johnson was fired for sleeping in the cooler. *Id.*

Johnson testified that he tried to return to work in 2003, but worked only a few days as he was unable to carry out his assigned duties. (Tr. 341.)

8

Johnson stated that he has a "bad heart" and is unable to stand and lift objects that he was formerly able to lift.  (Tr. 341.)  He opined that he can only walk for half of a block before getting tired and needing to sit and rest, but later stated  that he was able to walk for a couple blocks before requiring rest.  (Tr. 341.)  He feels "tremendous pain" in his lower back and suffers from shortness of breath.  (Tr. 341-42.)  It takes Johnson thirty minutes to walk two blocks, as he needs rest for approximately fifteen to twenty minutes during that period.  *Id*.

Johnson testified that he is able to stand for one hour and suffers increased pain in his lower back after that hour.  (Tr. 342.)  He is able to sit for one to two hours at a time, but, after an hour or two, he begins to suffer from chest pain and needs to move around.  (Tr. 343.)  After sitting for too long at home, Johnson uses his BiPAP and oxygen machines to relieve his chest pain.  *Id*.  He approximated that he is on his BiPAP machine for eight hours a day and uses his oxygen machine twice a week.  (Tr. 344-45.)  Johnson is able to lift objects that do not exceed five to ten pounds and experiences chest and lower back pain when attempting to lift heavier objects.  (Tr. 343.)

Johnson testified that he suffers from sleep apnea and has been using a BiPAP machine since 1994.  (Tr. 351.)  Regarding his hypothyroidism, Johnson indicated that he was taking Synthroid but continued to gain weight.  *Id*.  He was attempting to exercise more and was able to ride a stationary bike twice a week for a period of fifteen minutes.  (Tr. 352.)

Johnson indicated that he finds himself "puffing and panting and gasping for air" after exertion.  (Tr. 346.)  He stated that the BiPAP and oxygen machines help relieve his symptoms.  (Tr. 346.)  Johnson stated that his thyroid has a tendency to drain his strength and make him moody.  (Tr. 346.)

9

Johnson claimed that he had become depressed from others teasing him about the volume of his snoring.  (Tr. 346.)  He has feelings of general nervousness and depression that affect his memory and his ability to think straight.  (Tr. 347.)

During a typical day, Johnson usually wash the dishes and then watch television with his BiPAP machine and oxygen activated.  (Tr. 347-48.)  He noted that he is able to carry out his own household chores, but must stop and rest when he tires or starts to have pain.  *Id*.  He is able to bathe himself as well as cook for himself.  *Id*.  He only leaves the house a couple times a week to go to the store or the library.  *Id*.

Johnson stated that he smoked three cigarettes per day for the past year, but had smoked half a pack per day for twenty years.  (Tr. 349.)  He testified that he has not consumed an alcoholic beverage for over a year and a half and had not used illegal drugs since June of 2002.  *Id*.

At the time of the administrative hearing, Johnson was not receiving any psychiatric treatment, nor was he taking any psychiatric medications.  (Tr. 349.)

After reviewing the medical evidence and listening to Johnson's testimony, the ME testified to the following.  Johnson's impairments, either singly or in combination, did not meet or equal a listing.  (Tr. 352.)  Johnson's first limiting diagnosis was congestive heart failure, which he characterized as stable with no progression.  (Tr. 353.)  The ME indicated that Johnson's heart condition was non-ischemic cardiomyopathy, which is due to a muscle disorder rather than coronary artery disease.  (Tr. 353.)  Johnson's second limiting diagnosis was mixed obstructive and restrictive airways disease.  *Id*.  Johnson's third and fourth potentially limiting diagnoses were morbid obesity and hypothyroidism, respectively, with the latter being a

controllable issue with full ablation and thyroid replacement.  (Tr. 354.)  The ME stated that

Johnson's hypertension constituted another potentially impairing condition, but this condition

was under control.  (Tr. 354.)  Regarding Johnson's sleep apnea, the ME determined that he was

prescribed use of the BiPAP machine during both the day and at night.  (Tr. 354.)  The ME

determined that the lone x-ray in the medical evidence of Johnson's back was not indicative of

chronic limiting back pain.  (Tr. 355.)

 Initially, the ME testified that Johnson's standing and walking ability was limited to two

hours a day while his ability to sit was not limited.  (Tr. 356.)  The ME also stated that there is

"no reason [Johnson] couldn't lift 10 pounds frequently [and] 20 pounds occasionally."  (Tr.

356.)  Additionally, the ME testified that Johnson's obesity and cardiac and pulmonary issues

could lead to occasional postural limitations with respect to stooping, kneeling, and crawling.

(Tr. 357.)

 The ME later testified that standing was not an exertion whereas walking qualified as an

exertion.  (Tr. 360-361.)  The ME explained that Johnson was likely unable to walk for more

than two hours because of exertion.  (Tr. 363-364.)  The ME noted that Johnson is not oxygen-

dependent and it is sometimes easier for congestive heart failure patients to breathe while they

are standing rather than sitting or lying down.  (Tr. 364.)  However, based on his knowledge as a

cardiologist who had treated individuals with congestive heart failure, the ME also stated that

Johnson is not significantly limited in his ability to stand because the record demonstrates that

his congestive heart failure is stable.  (Tr. 363, 364.)  The ME testified that Johnson's complaints

of chest pain were not supported by the medical evidence and were not caused by coronary

disease.  (Tr. 365.)  The ME also testified that cardiomyopathy, congestive heart failure, and a

mixed pulmonary disorder limited Johnson's exertional abilities.  (Tr. 365-366.)  The ME added

that such aspects would not limit Johnson's ability to stand or sit.  (Tr. 366.)

In response to the ALJ's first hypothetical, the VE testified that a person who could lift

20 pounds occasionally and 10 pounds frequently, sit without limitation, and stand/walk for two

hours, and who had occasional postural limitations would be unable to perform Johnson's past

relevant work.  (Tr. 358.)  The VE also stated that all of Johnson's prior work was unskilled and

not transferable.  (Tr. 359.)  However, Johnson would be capable of performing a significant

number of light, unskilled jobs in the national economy, such as a toll collector or ticket seller.

(Tr. 359.)  The jobs identified "do not actually require more than two hours of standing and

walking."  *Id*.  The combined availability of these jobs are as follows: 19,000 jobs in Cleveland,

1,700,000 nationally.  (Tr. 359.)

In another hypothetical, the ALJ included the following limitations: lifting 20 pounds

occasionally and 10 pounds frequently; walking two to three hours in a day; standing for six

hours in a day; sitting for six hours in a day; and never climbing ladders, ropes, scaffolds.  (Tr.

360.)  In addition the hypothetical person should not be exposed to extreme temperatures, fumes,

dust, gases, poor ventilation, hazards, and unprotected heights.  *Id*.  The VE stated that such an

individual could perform the job of a cashier or checker as it is generally accomplished in the

national economy because the Dictionary of Occupational Titles ("DOT") classifies those jobs as

"light."  (Tr. 360.)  The VE stated that the aforementioned jobs could be classified as light with

respect to either standing and walking or lifting and carrying.  (Tr. 361.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, which can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when she became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.[1]

Johnson was insured on his alleged disability onset date, June 5, 2002, and remained insured through the date of the ALJ's decision, April 7, 2006.  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Johnson must establish a continuous twelve month period of disability commencing between June 5, 2002 and April 7, 2006.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir.

---

[1]    The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant is entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Johnson established a medically determinable, severe impairment, due to congestive heart failure, obstructive sleep apnea, hypothyroidism, morbid obesity, degenerative changes of the thoracic and lumbar spine, and complaints of stress, but his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ found Johnson can perform a limited range of light work and is able to perform his past relevant work as it is customarily performed in the national economy.  Therefore, the ALJ found Johnson is not disabled.

### V. Standard of Review

The court's review of the Commissioner's decision is limited to determining whether there is "substantial evidence" to support the Commissioner's decision and whether the Commissioner employed proper legal standards in reaching his or her conclusion.  Because the petitioner's request for review has been rejected, the decision of the ALJ is the final decision of

the Commissioner and is subject to this court's review.  Substantial evidence has been defined as

"[e]vidence which a reasoning mind would accept as sufficient to support a particular

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Kirk v. Sec'y of

Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  If substantial evidence for the

Commissioner's decision exists, the Court's "inquiry must terminate" and the final decision of

the Commissioner must be affirmed.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Furthermore, if the Commissioner's decision is supported by substantial evidence, the

Commissioner's determination must stand regardless of whether the reviewing court would

resolve the disputed issues of fact differently.  *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059

(6th Cir. 1983).

## VI.  Analysis

Johnson claims the ALJ erred by: 1) finding that Johnson can perform the exertional

demands of light work; and 2) failing to fully and fairly develop the record.  Each of these will

be discussed in turn.  Johnson also raised the following arguments that the Court declines to

consider: (1) the ALJ erred when he told the ME that he need not take Johnson's testimony into

consideration when developing his findings; and (2) the ALJ improperly asked follow-up

questions of the ME and VE "in an apparent attempt to elicit testimony which supported her

desired conclusion."[2]  (Pl.'s Br. at 9.)

---

[2]  Johnson fails to cite any law, regulation or ruling to support these alleged errors.  It is
not the Court's function to search for authority to support Johnson's undeveloped
argument.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues
adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived.  It is not sufficient for a party to mention a possible

***Ability to Perform Exertional Demands of Light Work***

Johnson argues that the ALJ's finding that he had an RFC for light work is contrary to the evidence.  (Pl.'s Br. at 7-8.)  Moreover, Johnson argues that the ALJ's failed to follow the regulations and the Social Security Administration's rulings.  *Id.*  The ALJ found that Johnson was capable of a performing a limited range of light work that involved lifting and carrying ten pounds frequently and twenty pounds occasionally, unlimited sitting, standing for six hours and walking for no more than two hours, and occasional stooping, kneeling, and crawling.  (Tr. 18; Def.'s Br. at 6.)

Johnson takes issue with the ME's testimony that standing is not an exertional activity. (Tr. 18, 360-361.)  Contrary to the ME's opinion, SSR 83-10 explicitly states that an exertional activity is "[o]ne of the primary strength activities (sitting, standing, walking, lifting, carrying, pushing, and pulling) defining a level of work."  Certainly, it is not an ME's function to redefine for the Social Security Administration ("SSA") which activities should be considered "exertional" for purposes of disability determination.  However, the ME's erroneous belief that standing is non-exertional does not render his opinion that Johnson could stand for six hours but only walk for two hours during an eight hour workday unreliable.  Furthermore, Johnson has not shown that the ME's erroneous belief that standing is nonexertional undermines the ME's professional opinion as to Johnson's ability to sit, stand, or walk when based on the medical

_____

argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, No. 04-4175, 2006 U.S. App. LEXIS 11680 (6th Cir. May 11, 2006; *Erhart v. Sec'y of Health & Human Servs.*, 989 F.2d 534, 537 n.5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'")  Therefore, these latter arguments are deemed waived.

16

records.  Thus, the ALJ could reasonably rely on the ME's testimony.

Johnson argues that the ALJ erred by finding that he could perform light work rather than sedentary work.[3]  Light work is defined as lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  "Even though the amount of weight lifted may be very little, a job is [deemed to be light work] when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  *Id*.  The full range of light work requires six hours of standing or walking, off an on, during an eight-hour workday.  *See* SSR 83-10.

While the Court is inclined to agree that Johnson is incapable of performing a full range of light work when limited to just two hours of walking per workday, the Court does not agree that the ALJ's RFC finding was erroneous.  First, the ALJ never found that Johnson was capable of performing a full range of light work.  Instead, the ALJ listed Johnson's exertional limitations that can best be described as a limited range of light work.  (Tr. 20.)  In his findings, the ALJ never uses the terms "full range of light work" or "limited range of lightwork" to describe Johnson's RFC.  (Tr. 20-21.)  However, the limitations the ALJ ascribed to Johnson are all consistent with the demands of light work except for the walking limitation.  Johnson's exertional level falls somewhere between the light and sedentary levels.

Johnson argues that his inability to walk for more than two hours per workday requires a

---

[3]  A finding that Johnson had an RFC for sedentary work, combined with Johnson's age, education, and previous work experience may mandate a finding of disabled according to the grids.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201 *et seq*.

17

finding of a sedentary level of exertion and a finding that he is disabled.  Johnson essentially is arguing that a claimant who cannot perform a full range of light work must necessarily be placed in the sedentary category.   Johnson fails to cite any law or regulation that requires an ALJ to apply the sedentary level grids in such a situation.  In fact, SSR 83-12, which applies in situations where a claimant falls between two exertional categories that would direct opposing disability findings, undermines Johnson's argument.  Instead of directing an ALJ to relegate a claimant to the lower exertional level, SSR 83-12 offers the following guidelines:

> 2. If the exertional level falls between two rules which direct opposite conclusions, *i.e.*, "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:
>
>> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>>
>> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."
>>
>> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability.  Accordingly, VS [vocational specialist] assistance is advisable for these types of cases.

Thus, SSR 83-12 essentially advises an ALJ to determine whether the occupational base has been so eroded as to shift a claimant to a lesser RFC, but does not compel particular findings of disabled or not disabled.  *See Templeton v. Comm'r of Soc. Sec.*, 215 Fed. Appx. 458, n. 2 (6th Cir. 2007).  The ALJ complied with the guidelines of SSR 83-12 and called a VE to testify. The ALJ gave the VE a hypothetical with the limitations described above.  (Tr. 360.)  The VE identified a number of light jobs that did not require more than two hours of walking and also

testified that Johnson could perform his past relevant work of cashier/checker as it is usually performed.  (Tr. 359-60.)  Although the ALJ did not specifically refer to SSR 83-12 and did not state the extent to which Johnson's RFC was diminished, these failures do not render the opinion deficient.  The VE's identification of a significant number within the light exertional range is sufficient to allow an ALJ to conclude that Johnson's exertional capacity at the light level was not significantly reduced.

For the foregoing reasons, Johnson's argument lacks merit.

### Full and Fair Development of the Record

Johnson argues that the ALJ violated his duty to fully develop the record by failing to obtain further consultative psychological examinations and ME testimony.  (Pl.'s Br. at 11-13.)

Generally, it is incumbent upon the claimant to provide a complete record upon which the ALJ can make an informed decision as to disability status, with "complete" defined as evidence complete and detailed enough to enable the Secretary to make a disability determination.  *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).  However, the ALJ also has a duty to ensure that a reasonable record has been developed.  *See Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986).  The ALJ's duty does not include the ordering of a consultative examination at the government's expense unless the record establishes that such an examination is necessary for a disability determination.  *See Landsaw*, 803 F.2d at 214.

The ALJ ordered a psychological consultative examination to be conducted by Dr. House, but Johnson did not attend the first scheduled appointment and left the second scheduled examination when it was only half completed.  (Tr. 290, 306.)  During the second appointment,

19

Dr. House noted that the claimant began to cry once the issue of substance abuse arose and subsequently left the evaluation.  (Tr. 291.)  Dr. House indicated that Johnson was instructed to call and make an appointment to be reexamined, but never did so.  (Tr. 290.)  20 C.F.R. § 404.1518(a) provides that:

> If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind. [...]  Therefore, if you have any reason why you cannot go for the scheduled appointment, you should tell us about this as soon as possible before the examination date.  If you have a good reason, we will schedule another examination.  We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have a good reason for failing to attend a consultative examination.

It is unclear from the record whether Johnson had "good reason" for not attending the first scheduled examination.  Examples of  "good reasons" include the following: illness on the date of the scheduled examination or test; not receiving timely notice of the scheduled examination or test, or receiving no notice at all; being furnished incorrect information, or being given incorrect information about the physician involved or the time or place of the examination or test; or having had death or serious illness occur in the immediate family.  *See* 20 C.F.R. § 1518(b); *see also Pearce v. Sullivan*, 871 F.2d 61, 63 (7th Cir. 1989) (affirming an ALJ's decision denying disability benefits on the basis that claimant had failed to cooperate during a consultative pulmonary examination).

Under the circumstances, this Court declines to find that the ALJ erred in his duty to fully and fairly develop the record.  The ALJ's attempts to obtain a consultative examination were foiled by Johnson's repeated failure to cooperate.  Johnson has cited no law or regulation that suggests an ALJ is required to make additional attempts to obtain a consultative examination

after a claimant has refused to take part.  To remand this matter under such circumstances would

reward Johnson for failing to cooperate with the consultative examiner.

Johnson's argument that the ALJ erred by failing to fully and fairly develop the record

lacks merit.

### VII.  Decision

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner

supported by substantial evidence.  Accordingly, the decision of the Commissioner should be

AFFIRMED and judgment entered in favor of the defendant.

/s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: October 15, 2007

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within ten (10) days after being served with a copy of this Report and
Recommendation.  Failure to file objections within the specified time may waive the right
to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**